■ GEORGE C. TAGGART, as Administrator, Appellant, v ALEXANDER's, INC., Respondent, et al., Defendant. — In an action to recover damages, *inter alia,* for wrongful death, battery and false arrest, plaintiff appeals from a judgment of the Supreme Court, Queens County (Lonschein, J.), entered March 17, 1981,

which is in favor of defendant Alexander's, Inc., upon a jury verdict. Judgment reversed, on the law, and as between plaintiff and Alexander's, action severed and new trial granted, with costs to abide the event. Decedent, age 17, was stopped by defendant Mark Farmer, a security guard employed by the defendant Alexander's, Inc., while allegedly leaving an Alexander's department store with a garment which, defendants alleged, was being shoplifted. There was an altercation in which blows were exchanged and decedent fell to the ground and offered no further resistance. The central factual issue was whether Farmer then assaulted the allegedly immobile and helpless decedent, causing his death (as testified by two patrons of the store and decedent's friend), or whether the death was the accidental result of his striking his head against the floor at the end of the altercation. Farmer testified that he did not strike the decedent after he fell to the ground. This issue of whether Farmer used undue force or committed acts of brutality upon the decedent, was obfuscated by the summation of counsel for Alexander's. Over plaintiff's objection, (1) the character of the security guard was emphasized to raise an inference that he acted in conformance with his testimony that he did not strike the decedent after he fell to the ground, (2) an admitted erroneous reference was made to an alleged prior shoplifting by decedent at the Alexander's store and (3) a reference was made to a prior incident involving the decedent wherein he threatened and menaced people with a sword, although there was no evidence of such threatening or menacing. In his redirect testimony Farmer was permitted to explain that the reason why he had refused on cross-examination to repeat an alleged profanity expressed by decedent when he was stopped from leaving the store, was that he had a particular repugnance to the use of vulgarity because he had been ordained as a pastor of the Assembly of God (after the incident herein), and was presently teaching church classes twice a week. The court held that this was proper testimony because plaintiff's counsel had questioned the *bona fides* of Farmer's hesitation to repeat the expletive. The court explained to the jury that "[the fact] that I am permitting [mention of this ministry] now * * * has absolutely nothing to do with the facts of this case but only as it affects this witness' testimony with respect to the use of the word that I read. That and only that, and nothing but that." At the request of plaintiff's counsel, the trial court, at that point, instructed the jury in detail that a witness' occupation may not be the basis for testing the credibility of his testimony. As to Farmer's character, there was this colloquy during summation by counsel for Alexander's: "[Counsel for Alexander's]: One of the things you have to consider again is the background of the people you're dealing with. What type of person is Mark Farmer [the security guard], and also what has he done since that particular incident. He has gone back to school. He has got another full college degree. [Counsel for plaintiff]: I object to it. I object in the light of what the activities were on January 9th, as to what he did since then in judging his conduct on the 9th. That is unfair comment, and your Honor preliminarily instructed the jury as to why that evidence was permitted. THE COURT: Well, ladies and gentlemen of the jury, the activities of Mr. Farmer's life may be considered by you on the issue of credibility, whether he is telling the truth or not. Go ahead. [Counsel for Alexander's]: I want you to consider on the issue of credibility, I want you to consider what he has done since then. By his own testimony he had become a member of the Federal Government and he has another degree, went to John Jay College and he graduated in the sciences and he went on and made a career of police work. I submit he is also an ordained minister and he is very active in his ordained minister work, and he was ordained from the same congregation and the same church in which he

belonged to before this incident occurred." Then, after mentioning Farmer's career in the Marine Corps prior to the incident herein, counsel for Alexander's said: "I submit you have got to weigh *all* those things when you are weighing the believability [of] whatever happened that particular night" (emphasis added). There was then this colloquy: "[Counsel for plaintiff]: Objection. Objection to the conjecture, your Honor, as correlative to what happened that night. That is unfair. THE COURT: It is fair comment. Go ahead." The court had permitted Farmer's redirect testimony that he was a minister for the limited purpose of explaining why he had refused to repeat the obscenity, on the ground that his sincerity in that respect had been impugned by plaintiff's counsel. Yet the court went far beyond this when it sanctioned as "fair comment" the statement in summation that the jurors "have got to weigh all those things when you are weighing the believability [of] whatever happened that particular night." The subsequent charge to the jury did not correct this error. There was implicitly presented to the jury the concept that it was more likely that Farmer was telling the truth because he was a clergyman. As stated in *La Rocca v Lane* (37 NY2d 575, 583): "A clergyman is accorded high status by most members of our society * * * [and] is accorded a measure of respect and trust unlike that which is given to those of other vocations." Whatever marginal relevancy there was in the guard's pastorship on the issue of his sincerity in refusing to orally repeat the obscenity, it in no way justified the court's statement, in the presence of the jury, that it was proper for counsel to argue that Farmer's religious calling was one of the things it could weigh on "the believability [of] whatever happened that particular night" (see Richardson, Evidence [Prince, 10th ed], § 158). In summation, counsel for Alexander's was also permitted to argue (over objection) as follows: (1) *As to decedent's alleged history of shoplifting:* In the context of explaining why the security guard was watching decedent even before the alleged attempted shoplifting, counsel said: "[The security guard] didn't know that about him. Maybe he guessed when he saw what was happening [in] the doorway. Now, that isn't something you can put away. That is the same boy who less than a year had this incident in [defendant] Alexander's [store]". (In fact, as admitted in Alexander's brief, there was no prior shoplifting by decedent at its store.) (2) *As to decedent's propensity to aggression:* Counsel for Alexander's stated: "We * * * know he was aggressive * * * From the time his mother told us about the Brighton Beach subway station when he got aggressive; [same] when he was accosted or in some manner got into a disagreement among his friends and he went all the way back to his house. He took down a weapon, a sword. He came back to the subway station to work that out with the benefit of a sword and he threatened and menaced people with it." The trial court's charge to the jury included the following: "In September of 1975 Michael [the plaintiff's decedent] was accused of menacing on the subway." We note that there was no evidence of such threatening or menacing, and the mother's testimony on cross-examination as to this incident was inadmissible hearsay. Further, since there was no proper testimony or evidence of intoxication, it was error to permit the jury to speculate that decedent was drunk. In this connection, we note that such prejudice was exacerbated when, in the course of the summation by counsel for Alexander's (who stated that Farmer "attributed [decedent's] laying on the ground to having taken too much to drink" although the security guard had not so testified), the court stated, in the presence of the jury, that "this is the conclusion that he wishes the jury to adopt from what was testified to in this case."[*] This error was particularly highlighted, since it was the basis of the theory that the decedent's injuries resulted from his fall as a dead weight

---

[*] The fact that a bare "nurse's note", made shortly after decedent's admission to the hospital, stated that his vomit smelled of alcohol did not call for court-sanctioned

backwards and striking his head on a hard surface, which theory was developed by a hypothetical question posed by counsel for Alexander's to the medical examiner. The fundamental trial issue for jury determination was not the moral attributes of the decedent, nor the character of Farmer, nor the legitimacy of Farmer's refusal to repeat an obscenity, but the simple one of whether undue force or brutality had been used. Lazer, J. P., Mangano and Bracken, JJ., concur.

O'Connor, J., dissents and votes to affirm the judgment, with the following memorandum, in which Gulotta, J., concurs: Contrary to the majority's decision, I find no errors in the trial record warranting a conclusion that plaintiff had been deprived of a fair trial in this case. Plaintiff's case essentially rested· on the testimony of decedent's companion and two disinterested witnesses. The companion told the jury that he, decedent and a third young man entered the Alexander's department store in Rego Park, Queens, just before closing and separated to browse on different floors; as the witness and his friend rode up an escalator, the witness saw defendant Mark Farmer engaged in a struggle with the decedent, during which Farmer struck the decedent, threw him over his leg onto his face, and twice thereafter picked him up and threw him down again, first on his face and then on the back of his head. One disinterested witness came upon the scene after the struggle and saw Farmer, after conferring with someone in apparent authority, "flip []" decedent while frisking him and then handcuff him behind his back even though the youth was unconscious and bleeding. The second disinterested witness essentially agreed, seeing Farmer roughly frisking the decedent and, in so doing, "flipping" decedent's head from side to side as he lay on the floor; the head therefore struck the ground more than once during the search. Defendant Farmer testified that he was engaged in locking the inner set of doors when the decedent and his two companions entered the store after the closing announcement was made; he noticed that the trio "split up", two positioning themselves apart from decedent, who removed a coat from a rack near the doors. Decedent then looked about him and walked quickly back toward the entrance. After passing through the yet unlocked inner doors, and upon opening the outer door and stepping out, decedent hesitated when Farmer ordered him to stop and showed his store identification. Decedent turned, uttered a vulgarity and struck Farmer in the face. The two then engaged in a struggle, moving back through the vestibule between the outer and inner doors and into the store. Farmer struck the decedent in the jaw just about the time he saw decedent's two companions charging them; two police officers arrived from outside and stopped the companions. The decedent, meanwhile, had fallen backwards from Farmer's one blow; he sat up but one of the police officers directed him to lie down again. Farmer left the scene to telephone his superior and then returned; a police officer told him to handcuff the decedent, and Farmer did so after decedent obeyed his order to roll over. Farmer saw no blood and could not tell if decedent had been seriously injured; in fact, at this point decedent had gotten up from his supine position more than once. Farmer denied searching decedent prior to their arrival at the hospital, and he denied causing decedent's head to strike the floor after the fall. Farmer also denied that there was an unimpeded line of vision from the scene of the arrest to the escalator. The plaintiff's medical expert, who had performed the autopsy on decedent, testified that the cause of death had been a fractured skull and resulting brain injuries. He found no injury attributable to a blow on the face, but did find injuries attributable to a hypothetical situation representing plaintiff's version of the frisk. The major

speculation by the jury of intoxication in the absence of any testimony or other evidence in support thereof.

injury, however, was caused by a blow to the back of decedent's head, and the expert conceded that Farmer's version of a fall backwards onto the hard floor could have caused such injury. The jury answered "no" to all the pertinent interrogatories relating to false imprisonment, battery and wrongful death. The evidence on these issues, in my opinion, was not obfuscated by the improper admission of evidence or improper comment upon it. With respect to the admission of Farmer's testimony respecting his ministry in a church, the trial court properly ruled that such information could be elicited on redirect examination in order to refute an extensive attempt by counsel for plaintiff on cross-examination to impeach Farmer for his refusal to say aloud the vulgarity attributed to decedent by inquiring at length into Farmer's exposure to such vulgarity in the Marine Corps and the Federal Bureau of Prisons. This cross-examination had become quite heated, with plaintiff's counsel at one point accusing Farmer of being a "smart ass". The court had, however, twice instructed the jury on limiting the evidence of Farmer's background to his credibility, particularly in respect to his refusal to repeat the vulgarity on the stand; furthermore, the court limited such evidence to Farmer's present church office and term and refused to permit evidence of his past office as a pastor. In view of the fact that this case was essentially one of credibility, and in view of plaintiff's counsel's calculated emphasis on Farmer's alleged martial arts interest and Marine Corps training in his opening, cross-examination, and summation, there was no error. With respect to defense counsel's incorrect assertion that decedent had been involved in an "incident" less than a year earlier in the store, the record shows no evidence of — or attempt to show — any such prior incident at that store. The only evidence of a prior "incident" within a store was the apparent admission of decedent's companion on cross-examination to having taken something earlier from a different department store; decedent's mother recalled no such incident involving her son. The incident was never described to the jury and the court properly gave a limiting instruction to the jury. Therefore counsel's obvious misstatement of the evidence on summation did not prejudice plaintiff's case. With respect to defense counsel's reference to a prior incident involving decedent's use of a sword, the record shows that as part of his wrongful death case plaintiff's counsel duly emphasized decedent's good qualities and on direct examination of the decedent's mother elicited the fact that he had been "well loved by all", children and adults, and was "very athletic" and "liked to keep busy". Counsel specifically asked her "about his character? What kind of a boy was he with respect to character?", and was told he had been "honest", with no involvement in drugs or alcohol. On cross-examination, counsel for Alexander's elicited admissions from her that decedent stayed away from school and had, about four months prior to his death, had been involved in an incident in which, as counsel put it, "he was menacing [some]body or accused of menacing [some]body". Specifically, her son told her that after he had been accosted by some boys at a subway station, he went home, picked up a sword kept in the house, and went back to the station. Given such evidence, it cannot be said that counsel's use of it to rebut plaintiff's depiction of decedent as a good-natured, loving son was improper. Nor was the court's reference to the menacing incident inaccurate. With respect to defense counsel's remark on summation that Farmer "maybe" attributed decedent's lying on the floor after his fall to intoxication, the jury was properly asked to draw such an inference from uncontradicted evidence in a hospital record identified by plaintiff's medical witness. A nurse had noted in the record that at one point after admission the decedent's vomit smelled of alcohol. The medical witness said no alcohol had been found during the autopsy that took place some time later, but added that by the time of the

autopsy any alcohol would have metabolized and disappeared. Therefore, the trial court's refusal to limit the jury's discretion in weighing this evidence and drawing its own conclusion as to the effect of such alcohol on decedent during the struggle with Farmer was correct. The record, when viewed as a whole, fails to support plaintiff's contention on appeal that he was deprived of a fair trial. Nor are any of plaintiff's other points on appeal meritorious. The judgment, therefore, ought to be affirmed.

