[735 NYS2d 5]

ROBERT HUERTA, Respondent, v NEW YORK CITY TRANSIT AU-
THORITY, Appellant.

First Department, December 11, 2001

### APPEARANCES OF COUNSEL

*Brian J. Shoot* of counsel (*James M. Lane* on the brief; *Schneider, Kleinick, Weitz, Damashek & Shoot,* attorneys), for respondent.

*Lawrence Heisler* of counsel (*Steve S. Efron* on the brief; *Wallace D. Gossett,* attorney), for appellant.

### OPINION OF THE COURT

SULLIVAN, P. J.

Defendant New York City Transit Authority appeals from a judgment, which, following a jury trial, awarded plaintiff, Robert Huerta the sum of $1,342,630.58, reduced from $1,746,760.65 to reflect his comparative fault, as a result of personal injuries he sustained in an August 12, 1994 accident in which his foot became caught at the upper landing of an escalator leading from the subway station at Bowling Green. Plaintiff, a 36-year-old messenger at the time, sustained a degloving injury to his right foot in two areas, requiring multiple surgeries to date and further surgery in the future.

As plaintiff's evidence showed, his foot became caught in a gap that existed between the escalator steps and the combplate as the steps meshed into and under the combplate, which was welded to the platform at the top of the escalator and designed

to mesh with the grooves on each of the moving steps as they reached the platform. According to plaintiff's expert, a licensed professional engineer, the manufacturer's manual applicable to the escalator in issue specified that the clearance between the combteeth and the grooves of the steps should not exceed three-sixteenths of an inch. The expert testified that the accident could not have occurred if the escalator had conformed to the three-sixteenths of an inch standard. He also posited the theory that a gap between the step and the plate greater than the permissible standard could occur as a result of improper maintenance in replacing the "step wheels" on which the escalator steps were balanced. According to the witness, the replacement of worn step wheels without replacing the entire complement of step wheels could lead to mismatched wheel pairs and an unbalance and unevenness in the escalator steps.

After plaintiff's foot became lodged in the combplate, the escalator continued to operate with plaintiff standing at the top of the escalator, his foot caught underneath. A federal police officer sitting in his patrol car on the street in front of the station, hearing plaintiff's screams, rushed to the scene, located the emergency stop button and pressed it, stopping the escalator. It was estimated that plaintiff's foot remained lodged in the combplate for 45 minutes until it was freed. Plaintiff was taken by ambulance to the hospital.

Plaintiff's expert also testified that the Building Code required that every new and existing escalator be equipped with a "step lev‹ ‹ ‹.ce" and a "combplate stop switch,"[1] neither of which w›as present on the escalator in question. The former is a device, mounted in the top terminal of the escalator, designed to detect any mislevelling in excess of an eighth of an

---

1. Pursuant to administrative Code of the City of New York § 27-982, "[t]his subchapter shall establish the minimum safety requirements for, and control the design, construction, installation, alteration, maintenance, inspection, test and operation of, all elevators, dumbwaiters, escalators, moving walks, industrial lifts and loading ramps, automotive lifts, mechanical parking garage equipment, console or stage lifts, power operated scaffolds, amusement devices, and special hoisting and conveying equipment." Pursuant to section 27-987, "[a]ll of the equipment listed in section 27-982 of this article shall be designed, constructed, altered and maintained as required by the provisions of this subchapter and reference standard RS-18." RS 18 (Administrative Code, tit 27, ch 1, Appendix) refers to certain national safety standards relating to elevators and escalators (ANSI/ASME-Safety Code for Elevators and Escalators and Supplements, A17.1-1987—A17.1A-1998), including three rules, 802.6a, involving combplates; 805.1s, concerning combplate stop switches; and 805.1t, relating to combplate step impact devices, that were submitted to the jury.

inch and to stop the escalator immediately upon detecting any such misalignment. The combplate stop switch is triggered after a foot or other object becomes caught in the escalator mechanism. As soon as the device measures 30 pounds of force the escalator is brought to an immediate stop.

According to the Transit Authority's Ejection/Aid Report concerning the incident, plaintiff stated that "he was on [the] escalator * * * going up [and] turned around to talk to a lady not realizing he was upon top of ending of escalator. [His] foot got caught between last step and the grating." The Transit Authority also presented witnesses who testified that the sneakers worn by plaintiff at the time, one of which was caught in the escalator mechanism, were "mushy and soft" and "badly worn," suggesting that plaintiff's foot became lodged between the escalator step and the combplate not because of any gap between the two but, rather, because of the condition of his sneaker.

At the close of the evidence, the court, in its charge, listed five theories under which the Transit Authority could be found liable. Under common-law negligence, the court charged that the jury could find the Authority negligent if it found that the Authority, in the exercise of due care, should have discovered a problem with the escalator but failed to do so. The remainder of the charge on liability dealt with the various Code provisions relating to escalator safety. The court instructed the jury that plaintiff was alleging that the Transit Authority violated section 27-982 of the Administrative Code, which establishes the minimum safety requirements for the design, construction, installation, alteration, maintenance and operation of elevators and escalators. The court further charged the jury that in accordance with these requirements the provisions of a reference standard, known as RS 18, which set forth detailed engineering guidelines compiled by professional groups such as the American Society of Mechanical Engineers (ASME), were incorporated into the Code. The charge set forth ASME's requirements with respect to combplates, step level devices, combplate stop switches and combplate step impact devices, allowing the jury to consider four separate violations of the reference standard provisions.

In responding to the questions posed on the verdict sheet, the jury found, insofar as is relevant, that: (1) the Transit Authority had been negligent, (2) the Transit Authority's negligence had not been a substantial factor in causing plaintiff's accident, (3) the Transit Authority did not fail to

comply with the Administrative Code provision relating to combteeth adjustment, (4) the Transit Authority had not complied with the Administrative Code provision concerning step level devices, (5) the Transit Authority's violation of this statutory section had been a substantial factor in causing the injury to plaintiff, (6) the Transit Authority had also failed to comply with the Administrative Code provision dealing with combplate stop switches, (7) the Transit Authority's violation of this provision had been a substantial factor in the accident, (8) plaintiff had been negligent as well, (9) plaintiff's own negligence had been a substantial factor in his injury and (10) the Transit Authority was 79% responsible for the accident, while plaintiff's responsibility amounted to 21%. As previously noted, the jury's total award of damages was reduced to take into account plaintiff's comparative negligence.

The Transit Authority then moved to set aside the verdict and for judgment in its favor based on the jury's answer to interrogatory #2 or, alternatively, for a new trial or reduction in the amount of damages awarded. Plaintiff opposed the motion and cross-moved to set aside the jury's finding that he bore 21% of the responsibility for the accident. The trial court denied both motions and this appeal followed.

■ Citing, *inter alia*, Public Authorities Law § 1204 (5-a),[2] which confers upon a public benefit corporation broad powers to manage its own affairs, the Transit Authority argues that as a creature of the New York State Legislature it is not subject to the regulatory safety standards promulgated by the City of New York or even by any of the State's agencies. It argues, quoting the Court of Appeals, that public benefit corporations "are 'independent and autonomous' to the extent that they should be free from requirements imposed on other State agencies that would interfere with the accomplishment of the public corporation's purpose." (*Matter of Levy v City Commn. on Human Rights*, 85 NY2d 740, 745, quoting *Matter of Plumbing, Heating, Piping & Air Conditioning Contrs. Assn. v New York State Thruway Auth.*, 5 NY2d 420, 423.) Furthermore, the Transit Authority argues, citing *Consolidated Edison Co. v*

---

2. Insofar as is relevant, Public Authorities Law § 1204 provides:
"General Powers of the authority * * *
"5-a. To make, amend and repeal rules governing the conduct and safety of the public as it may deem necessary * * * for the use and operation of the transit facilities under its jurisdiction, including without limitation rules relating to the protection or maintenance of such facilities, the conduct and safety of the public."

*Town of Red Hook* (60 NY2d 99), that any competing local legislation, such as the Administrative Code of the City of New York, is preempted by the State's grant of power to the Transit Authority as set forth in the Public Authorities Law and, citing *Matter of Ardizzone v Elliott* (75 NY2d 150, 155), that the Administrative Code's regulatory requirements are inconsistent with State law. None of these arguments has merit.

While the Transit Authority correctly argues that it has a statutory right to make and amend rules "relating to the protection or maintenance of such [transit] facilities" (Public Authorities Law § 1204 [5-a]), to "improve, maintain and operate any transit facility" (§ 1204 [8]) and to "direct the maintenance and operation of transit facilities" (§ 1204 [15]), the fact remains that the City of New York has the authority "to adopt and amend local laws" relating to, *inter alia*, the "safety, health and well-being of persons or property therein" (NY Const, art IX, § 2 [c] [ii] [10].)

Whatever may be the rule in deciding where one governmental entity's authority begins and another's ends or as to which governmental entity should prevail where their interests conflict,[3] the law is well settled that, for purposes of tort law, a governmental entity is liable for failure to comply with the same minimum regulatory standards as are applicable to all similarly situated landowners if the challenged conduct is proprietary and not governmental in nature. "As a landowner, a public corporation acts in its proprietary capacity rather than its governmental capacity and owes the same duty of care as that of a private individual. State agencies are subject to local laws and regulations when acting in a proprietary as opposed to a governmental capacity." (62A NY Jur 2d, Government Tort Liability, § 194.)

The Court of Appeals has repeatedly held that the Transit Authority's maintenance of its subway stations is a proprietary function (*Weiner v Metropolitan Transp. Auth.*, 55 NY2d 175, 181; *Clinger v New York City Tr. Auth.*, 85 NY2d 957, 959) and that, for purposes of tort law, the Transit Authority is "subject to the same duty of care as any other potential tortfeasor— reasonable care under all of the circumstances" (*Bethel v New York City Tr. Auth.*, 92 NY2d 348, 356).

Furthermore, *Matter of Levy v City Commn. on Human Rights* (85 NY2d 740, *supra*), upon which it relies, does not

---

**3.** For example, where the issue is between city and county over land use, there must be a "balancing of public interests." (*Matter of County of Monroe [City of Rochester]*, 72 NY2d 338, 340.)

support the Transit Authority's position. The question in *Levy* was whether the Transit Authority could be compelled to comply with New York City's anti-discrimination standards. There, as here, the Authority argued that the City of New York lacked the power to adopt local laws that might impair the powers of any other public corporation. (*Id.* at 746.) While acknowledging that the Authority, independent and autonomous, "should be free from requirements imposed on other State agencies that would interfere with the accomplishment of the public corporation's purpose" (*id.* at 745), the Court of Appeals rejected its argument, stating, "It cannot be seriously contended—nor does the Transit Authority press such an argument—that compliance with the prohibitions against employment discrimination would interfere with its function and purpose, particularly where employment practices are tangential to the Transit Authority's mission." (*Id.*) As with *Levy*, compliance with minimal escalator safety requirements would hardly interfere with the accomplishment of the Transit Authority's purpose.

Similarly without merit is the Transit Authority's preemption argument. *Consolidated Edison Co. v Town of Red Hook* (60 NY2d 99, *supra*), upon which it relies, did not involve the question of whether a public authority had to observe local regulatory safety standards but, rather, whether a town could deny a power company the right to locate within its geographical jurisdiction even though the State had an administrative process available for the siting of electrical plants. The Court held that the town could not thwart the State approval process "because the Legislature has pre-empted such local regulation in the field of siting of major steam electric generating plants" (*id.* at 105) and "the provisions of Local Law No. 2 affecting power plant studies are inconsistent with article VIII of the Public Service Law, which is a general law relating to matters of substantial State concern" (*id.* at 107). Here, the Transit Authority does not and cannot point to any State law expressly or impliedly preempting the Administrative Code in the area of escalator safety or to any inconsistency in the latter with State law.

Finally, on this point, both this Department and the Second Department have flatly rejected the Transit Authority's claim that it is immune from the City's regulatory safety standards. (*D'Arpa v New York City Tr. Auth.*, 239 AD2d 126; *Farrington v City of New York*, 240 AD2d 697.) In *Dempsey v Manhattan & Bronx Surface Tr. Operating Auth.* (214 AD2d 334), this

Court, confronted with the same argument as is made here, ruled: "The IAS Court correctly held that defendants-appellants State agencies are subject to local laws and regulations when acting in a proprietary as opposed to governmental capacity * * * [and] their alleged failure to properly maintain the premises in violation of the Administrative Code and Fire Department Rules was proprietary in nature." (*Id.* at 334.)

The Transit Authority also argues that the Administrative Code and City Charter make explicit that the Building Code's provisions do not apply to transit facilities. It relies upon two provisions, Administrative Code § 26-205 and New York City Charter § 643, to argue that the subways are excluded from the Building Code's jurisdiction. Supposedly, section 26-205 establishes the non-applicability of the Building Code (Administrative Code of City of NY, tit 27, ch 1)[4] when it states, "[N]or does this subchapter apply to structures on waterfront property used in conjunction with and in the furtherance of waterfront commerce and/or navigation, or to bridges, tunnels or subways, or to structures appurtenant thereto." This argument is without merit. Section 26-205 is not in the Building Code, which, as noted, is in title 27 of the Administrative Code, not title 26. Thus, when section 26-205 states that "this subchapter" does not apply, it is not referring to the Building Code, but to subchapter 3 of chapter 1 of title 26, of which it is part. As the exemption from "this subchapter" does not refer to the Building Code or to any provision that the Transit Authority was charged with violating, it is irrelevant to this appeal.

The Transit Authority's other argument as to why it is exempt from the Building Code revolves around section 27-103 of the Administrative Code, which provides that the Building Code applies to all building construction, alteration, repair, and maintenance "except as provided in section six hundred forty-three of the [New York City] charter." New York City Charter § 643 states that "[t]he [D]epartment [of Buildings] shall enforce * * * such provisions of the building code, zoning

---

4. Section 27-101 of the Administrative Code states that "[t]his code shall be known and may be cited as the 'building code of the [C]ity of New York.'" Section 27-102 states that "[t]he purpose of this code is to provide reasonable minimum requirements and standards * * * in the interest of public safety, health and welfare, and with due regard for building construction and maintenance costs." Section 27-104 states that "[t]his code shall be liberally interpreted to secure the beneficial purposes thereof," with the proviso that "[a]ny conflict or inconsistency between the requirements of this code and applicable state and federal laws and regulations shall be resolved in favor of the more restrictive requirement."

resolution, multiple dwelling law, labor law and other laws, rules and regulations as may govern the construction, alteration, maintenance, use, occupancy, safety, sanitary conditions, mechanical equipment and inspection of buildings or structures in the city," but that, with certain stated exceptions, "the jurisdiction of the department * * * shall not extend to waterfront property * * * or to bridges, tunnels or subways or structures appurtenant thereto." (§ 643 [7].) The statute's language clearly limits the exemption to a subway or structure appurtenant to a subway, not an escalator.

■ The Transit Authority next argues that the trial court erred in charging the jury that if it "violated any provisions of [the Administrative Code requirements] and if that violation was a proximate cause of the injury to plaintiff," it would have to find it liable as a matter of law. No exception was taken to this particular aspect of the charge, which was seemingly correct at the time based upon the Court of Appeals language in *Guzman v Haven Plaza Hous. Dev. Fund Co.* (69 NY2d 559, 565 n 3, quoting *Hart v City Theatres Co.*, 215 NY 322, 326), that the " 'Building Code [of the Administrative Code] has all the force of a statute in the city of New York.' " In fact, in *Elliott v City of New York* (267 AD2d 62, *revd* 95 NY2d 730) decided in 1999, this Court held that an owner's non-compliance with the Building Code constituted negligence as a matter of law. By decision rendered four days after the filing of the Transit Authority's brief in this appeal, however, the Court of Appeals reversed this Court's ruling in *Elliott*, holding that, with the exception of those Code provisions the content of which was approved or adopted by the Legislature, a Building Code violation would have the same tort consequences as a violation of any other pertinent ordinance. (95 NY2d 730.)[5] That is, it would be merely evidence of negligence. Thus, as plaintiff concedes, by virtue of the Court of Appeals decision in *Elliott*, the charge was incorrect.

The Transit Authority argues that, although unpreserved, the error was fundamental and should be reached because a

---

**5.** Although the *Elliott* Court acknowledged that some Administrative Code provisions might be entitled to statutory treatment if they "ha[d] their origin in State law" (*id.* at 736, citing *Guzman v Haven Plaza Hous. Dev. Fund Co., supra*, 69 NY2d at 565 n 3), it did not identify the specific Code provisions that meet this description. Certainly, there was no showing in this case that the Code provisions in issue had State law origins. Accordingly, as in *Elliott*, the specific duty provisions of the Administrative Code "must be treated as any other local enactment [where] its status is that of a local law." (95 NY2d at 736.)

timely exception would have been unavailing since the charge conformed with prevailing First Department precedent (see, *Elliott v City of New York, supra,* 267 AD2d 62). Given that the verdict on liability was predicated solely upon the Transit Authority's violation of the Administrative Code, the error in the charge "preclude[d] consideration of the central issue upon which the claim of liability is founded." (*Rivera v Bronx-Lebanon Hosp. Ctr.,* 70 AD2d 794, 796.) Thus, we reach the error in the exercise of discretion and remand for a new trial.

Although the Transit Authority cites a series of evidentiary rulings as error, only one has merit. According to a testifying Transit Authority police officer, plaintiff admitted not only that he had been talking to the woman behind him but that he had drunk "five to six beers." An August 12, 1994 hospital entry notes that plaintiff was positive for ETOHA (ethol alcohol abuse). Another note states that plaintiff was positive for "ETOH smell." Despite this good faith basis, whenever the Transit Authority's attorney broached the subject of plaintiff's drinking, the trial court precluded any questioning. Similarly, it refused to allow counsel to question plaintiff's doctor about the effect of alcohol on plaintiff's concentration. While the answers to such questions, if positive, might not by themselves be sufficient to establish intoxication (see, *Coleman v New York City Tr. Auth.,* 37 NY2d 137; see also, *Taggart v Alexander's, Inc.,* 90 AD2d 542), they were relevant to the issue of plaintiff's attentiveness at the time he reached the elevator platform and should have been allowed.

We have considered the other cited errors, except for the issue of damages, which we do not reach, and find them to be without merit.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Sheila Abdus-Salaam, J.), entered May 25, 2000, which, after a jury trial, awarded plaintiff the sum of $1,342,630.58, should be reversed, on the law, the facts and in the exercise of discretion, without costs or disbursements, and the matter remanded for a new trial.

MAZZARELLI, WALLACH, RUBIN and FRIEDMAN, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered May 25, 2000, reversed, on the law, the facts and in the exercise of discretion, without costs or disbursements, and the matter remanded for a new trial.