The TRAVELERS INDEMNITY COMPANY OF ILLINOIS a/s/o Prada USA Corp. and Madison Development Corp., Plaintiff,

v.

28 EAST 70TH STRET CONSTRUCTION COMPANY, INC., Bovis Lend Lease LMB, Inc., Breyer Blinder Belle, Architects & Planners LLP, A.D. Winston Corp., Giamboi Bros., Inc., Pawl Fire Protection Corp., and Mocar Construction Co., Inc. Defendants.

28 East 70th Street Construction Company, Inc. and Bovis Lend Lease LMB, Inc., Third–Party Plaintiffs,

v.

Sirina Fire Protection Corp. and Coordinated Metals, Inc., Third–Party Defendants.

No. 01 Civ. 3001(JGK).

United States District Court, S.D. New York.

Dec. 22, 2003.

Michael B. Golden, R. Kelley Franco, Robinson & Cole, L.L.P., New York City, for Plaintiffs.

Charles D. Cole, Jr., Ian Foster Harris, Newman, Fitch, Altheim, Myers, P.C., Daniel J. Friedman, Eugene R. Scheiman, Robert S. Bernstein, Buchanan Ingersoll, P.C., New York City, for Defendants.

Christopher A. South, Law Offices of Charles J. Siegel, New York City, for Third Party Defendant.

### OPINION and ORDER

KOELTL, District Judge.

This case involves the flooding of a Prada store allegedly caused by a frozen water pipe that burst. A suit was filed by Travelers Indemnity Company of Illinois ("Travelers"), as property insurer and subrogee of Prada USA Corp. ("Prada") and Madison Development Corp. ("Madison Development"), the owner of the premises.[1] The plaintiff claims that the pipe froze because the roll-down security gate was improperly installed, allowing cold air to travel through an open slot into the first floor ceiling space. Three of the defendants and the third-party defendant have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure: Bovis Lend Lease LMB, Inc. ("Bovis") was the construction manager for the Prada store; Beyer Blinder Belle Architects & Planners LLP ("BBB") was the local architect of record during the construction of the store; Giamboi Bros., Inc. ("Giamboi") was hired by Bovis as the subcontractor for drywall and rough carpentry work; and Sirina Fire Protection Corporation (Sirina) was hired to install the store's sprinkler system, including the pipe elbow joint that burst.[2]

### I.

The standard for granting summary judgment is well established. Summary Judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Gallo v. Prudential Residential Servs. Ltd., 22 F.3d 1219, 1223 (2d Cir.1994). "The trial court's task at the summary judgment motion stage of

---

1. An insurer suing as a subrogee generally "stands in the shoes" of its insured. The subrogee who has paid the loss is entitled to seek indemnification from third parties whose wrongdoing has caused the insured's reimbursable loss, but the third parties are also entitled to assert any defenses they would have against the insured. See Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA, Inc., 344 F.3d 211, 218 (2d Cir.2003); EL-RAC, Inc. v. Ward, 96 N.Y.2d 58, 724 N.Y.S.2d 692, 748 N.E.2d 1, 8 (2001).

2. Counsel for Bovis has also moved for summary judgment dismissing the claims against its other client, defendant 28 East 70th Street Construction Co. The plaintiff represented at the argument of the motions that there are no claims still being asserted against that defendant. Any claims against the defendant 28 East 70th Street Construction Co. are therefore dismissed.

the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Gallo,* 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993); *see also Scotto v. Almenas,* 143 F.3d 105, 114–15 (2d Cir.1998) (collecting cases).

The plaintiff has brought this case pursuant to the Court's diversity jurisdiction, 28 U.S.C. § 1332. There is no dispute that New York contract and tort law apply.

## II.

There is no dispute as to the following facts except where noted. This case involves a Prada store located on the first floor of a building owned by Madison Development on the southeast corner of 70th Street and Madison Avenue in Manhattan. (*See* Pl.'s First Am. Compl. Against All Defs. and Third–Party Defs. ¶¶ 1–2, 8–9.) In 1996, Prada undertook construction of its retail space, hiring Bovis as the construction manager. (*See* Bovis's Rule 56.1 St. ¶ 1, Ex. C (Construction Manager Agreement, dated May 1, 1996).) Bovis contracted with Giamboi to do drywall and rough carpentry work. (Giamboi's Rule 56.1 St. ¶ 10.) Prada hired BBB to be the local architect of record (BBB's Rule 56.1 St. ¶¶ 4–5), and Sirina was hired to install the sprinkler system. (Sirina's Rule 56.1 St. ¶ 5.) The store opened in October 1996. (Tr. of Dep. of Eva Baud, dated Feb. 7, 2002, at 6, attached at Reply Mem. of Law of Def. Bovis, Ex. I.)

On January 19, 2000, a sprinkler pipe located in the ceiling space above the first floor of the premises burst, flooding the store and causing damage alleged to be in excess of $715,000. (*See* Pl.'s First. Am. Compl. ¶¶ 1–3; BBB's Rule 56.1 St. ¶¶ 1–2; Giamboi's Rule 56.1 St. ¶ 1.) The plaintiff retained two experts to determine why the pipe burst. (*See* Aff. of James M. Ruel in Opp. to Defs.' Mots. for Summ. J. ("Ruel Aff."), sworn to May 2, 2003, ¶ 3.) The first expert found that the elbow joint of the pipe was exposed to temperatures that caused ice to form and burst the frozen pipe. (*See id.* Ex. A (Special Claims Re-

port submitted by Phillip E. Crombie); BBB's Rule 56.1 St. ¶ 2.)

A second expert, Vincent G. Riverso ("Riverso"), tracked how the pipe was exposed to such low temperatures. (*See* Rep. of Vincent G. Riverso ("Riverso Rep."), dated May 9, 2002, at 1, attached at Ruel Aff., Ex. B.; Aff. of Vincent Riverso ("Riverso Aff."), sworn to May 2, 2003, ¶ 1, attached at Ruel Aff., Ex. D.) He determined that two openings contributed to exposing the pipe to cold air from the outside. The first opening was in the area above a roll-down security gate, which was installed in front of the entrance of the store. (Riverso Rep. at 3.) The solid Plexiglass gate, when in the down position, left an open slot while also directing cold winds into the area above the vestibule of the store entrance. (*Id.*) Pressure then forced the cold air through a second opening that was left between a duct and sheetrock that was supposed to seal off the area above the mechanical gate from the first floor ceiling space where the sprinkler pipe was located. (*Id.*)

The plaintiff's expert noted that there was no perimeter insulation around the duct, which penetrated the sheetrock. There was thus no seal preventing the cold air in the area above the security gate from entering the first floor ceiling space and reaching the sprinkler pipe. (*Id.* at 7.) The expert further noted that he did not observe firestopping in the area above the security gate, although firestopping was required under the New York City Building Code § 27–345. (*Id.* at 3, 7.) Had firestopping or insulation been installed, it would have prevented the free flow of air through the ceiling space. (*Id.* at 3–4, 7.) The plaintiff's theory, based in large part on Riverso's expert report, is therefore that there were two failures during the construction of the Prada store that led to the flooding. The first was in installing the roll-down security gate in a way that left an open slot when the gate was in the down position. The second was in not insulating or firestopping the area adjacent to the ductwork.

The security gate was initially installed in September 1996 on the inside of the store, behind glass doors at the entrance. (Bovis's Rule 56.1 St. ¶¶ 8–9.) Prada had contracted with W & W Glass Products, Inc. ("W & W Glass") to do glass work for the store's main entrance, and W & W Glass hired Coordinated Metals, Inc. to do the metal work, including the installation of the roll-down security gate. (Bovis's Rule 56.1 St. ¶¶ 5–7.) If the security gate had remained on the inside of the store, the glass doors would have protected the security gate opening and cold air would not have entered the first floor ceiling space. (Riverso Rep. at 7; Giamboi's Rule 56.1 St. ¶ 3.) But in November 1996, Prada requested that the gate be moved to the outside of the glass doors to secure the vestibule area. (Bovis's Rule 56.1 St. ¶ 10.) Bovis instructed W & W Glass and Coordinated Metals to relocate the gate according to plans drawn up by Prada's architect, but Coordinated Metals did not actually relocate the gate, and the parties have not been able to identify who did. (*Id.* ¶¶ 11–13.)

### III.

Travelers has sued Bovis for breach of contract, alleging that Bovis breach the requirements of its Construction Manager Agreement ("CM Agreement"). Travelers has also sued Bovis on a claim of negligence, alleging that Bovis negligently performed its duties as construction manager. A central issue in dispute with respect to both the breach of contract and negligence claims against Bovis is whether Bovis, as the construction manager, breached a duty to supervise and inspect the relocation of the security gate and the installation of

firestopping and insulation around the ductwork. Travelers argues that the duty existed both pursuant to the contract and under the common law. Bovis argues that the contract holds Bovis responsible only for work that it actually did and not for the work of the architect or other agents hired by Prada, and that there is no evidence that it negligently performed any of its duties as a construction manager.

To absolve itself of responsibility, Bovis relies on Article 10.21 of the CM Agreement, which states that the construction manager will "not be responsible for . . . Owner's or Architect's (and their respective agents', employers', Contractors' and subcontractors') acts, omissions to act, or failure to timely act." (*See* CM Agreement art. 10.21, attached at Bovis's Rule 56.1 St., Ex. C.) Article 10.21, however, is a *force majeure* clause, absolving Bovis of responsibility for unforeseen damages caused by things such as floods, riots, labor strikes, sabotage, and "other matters beyond the reasonable control of Construction Manager." (*Id.*) While that list includes acts and omissions by the owner, architect, and their agents, Article 10.21 does not unambiguously address a situation where Bovis arguably had a duty to inspect and supervise the work by subcontractors or the architect.

Moreover, as the plaintiff points out, a number of clauses in the contract suggest that Bovis would be responsible for supervising the work of others. For example, Bovis is required to "furnish the high quality skill and judgment consistent among high quality construction managers" in New York County. (*Id.* art. 1.1.3). It had a duty to "comply with all legal requirements" during construction and "promptly notify Owner and Architect of such variance" that it observes. (*Id.* art. 2.3.13). "When the Construction Manager consider[ed] each Contractor's Work or a designated portion thereof substantially com-

pleted," it had the duty to "prepare with the Architect a list of incomplete or unsatisfactory items and a schedule for their completion." (*Id.* art. 2.3.40.) The Construction Manager also had a general duty to "inspect the Work of each of the Contractors and the installation of material and equipment to protect Owner against defects and deficiencies in the Work." (*Id.* art. 2.3.46).

Bovis argues that the job of a construction manager is to manage the project generally and not to supervise or assume responsibility for the work of the subcontractors. Bovis thus seeks to minimize the duties required by the contractual provisions calling for Bovis to provide "high quality skill and judgment," to ensure compliance with legal requirements, and to inspect the work of various contractors. Under New York law, a court should interpret a contract to uphold the intent of the parties and should enforce provisions as written as a matter of law if the contract is unambiguous. *Bourne v. Walt Disney Co.*, 68 F.3d 621, 628–29 (2d Cir. 1995). However, where the contractual language is subject to more than one reasonable meaning, then the interpretation of the contract is a matter of fact for the trier of fact, extrinsic evidence of the parties' intent is admissible, and summary judgment is inappropriate. *See id.* at 629; *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573–74 (2d Cir.1993).

In this case, the contract is ambiguous as to the extent of Bovis's duties to supervise and inspect the work of the subcontractors, in particular, the installation of the security gate, firestopping, and ductwork insulation. At the argument of the motion, Bovis acknowledged that if it arranged for and observed the installation of the security gate, it would have had at least some duty to inspect and supervise the work. Instead of relying on a blanket

contractual protection from liability, Bovis emphasized that no one can identify precisely who moved the security gate, and it speculated that Prada might have handled the reinstallation. Travelers-standing in the shoes of Prada-and Bovis have each argued that the other party is in the best position to know who relocated the gate.

Richard McKinley ("McKinley"), the project manager for Bovis on the Prada project, testified in his deposition that it was Bovis's responsibility "to do whatever was required to make [the relocation of the gate] happen." (Tr. of Dep. of McKinley, dated Nov. 20, 2002, at 39 ("Nov. 20 McKinley Dep."), attached at Aff. of Jennifer R. Freedman ("Freedman Aff."), dated Mar. 18, 2003, Ex. K.) Meanwhile, documents show that Bovis was in contact with W & W Glass and Coordinated Metals in November 1996, when W & W Glass removed the doors at the entrance to allow for the relocation of the gate and then reinstalled the doors after the relocation was complete. (*See* Bovis's Rule 56.1 St., Exs. E–G.) Finally, Bovis has been unable to produce documents detailing when its involvement in the Prada store project ceased. There are thus substantial issues of fact as to Bovis's role in and responsibility for the relocation of the security gate.

With respect to the second opening adjacent to the ductwork, Riverso, the plaintiff's expert, opined in his report that Bovis, as the construction manager, "should have insisted, despite a lack of the requirements on the plans, to have the area adjacent to the ductwork firestopped or sealed." (Riverso Rep. at 4.)[3] Riverso is

the president of a construction consulting firm who has acted as construction project manager several times and has a law degree as well as masters in civil engineering. (Ruel Aff., Ex. B., Riverso Curriculum Vitae.) The contract calls for Bovis to "furnish the high quality skill and judgment consistent among high quality construction managers" (CM Agreement art. 1.1.3) and to "inspect ... the installation of material and equipment to protect Owner against defects and deficiencies in the Work" (*id.* art 2.3.46). There are genuine issues of material fact as to whether Bovis's actions or inactions in connection with the relocation of the security gate and the installation or failure to install insulation or firestopping in the area above the gate breached any of Bovis's contractual obligations.[4]

The negligence claim against Bovis is based on the theory that Bovis failed to exercise due care while performing its contractual duties of supervising and inspecting the work at the Prada store. *See AT & T Co. v. N.Y. Human Res. Admin.*, 833 F.Supp. 962, 984–85 (S.D.N.Y.1993) (explaining that, under New York law, independent duty of care can arise out of relationship created by contract, such as duty of care required of professionals providing services); *Sears, Roebuck & Co. v. Enco Assocs., Inc.*, 43 N.Y.2d 389, 401 N.Y.S.2d 767, 372 N.E.2d 555, 556 (1977) (stating that architects could be sued either in contract or in tort for property damage allegedly caused by negligent work). Bovis cites *Moore v. Charles T. Wills, Inc.*,

3. At the time Riverso completed his expert report, he did not know if Bovis was a construction manager or general contractor, and thus he framed Bovis's alleged breach of duty in terms of both possible positions.

4. Travelers has argued that the opening adjacent to the ductwork existed before the gate was moved, and Bovis could thus be liable

even if it were not actually involved in the relocation of the gate. Bovis explicitly maintained at the argument of the motion that whether there was an opening in the perimeter insulation before the security gate was relocated is a disputed issue of fact. Bovis's contention in this regard only confirms the Court's conclusion that there are genuine issues of material fact as to Bovis's liability.

250 N.Y. 426, 165 N.E. 835, 835–36 (1929), for the general proposition that a construction manager or general contractor is not liable for the independent negligent acts of subcontractors, even if the contractor retains a limited power of supervision. *See also Broderick v. Cauldwell–Wingate Co.*, 301 N.Y. 182, 93 N.E.2d 629, 631 (1950). However, *Moore* and the other cases cited by Bovis involve a general contractor's duty (or lack thereof) to provide for the safety of a subcontractor's employees on a day-to-day basis. *See Genovese Drug Stores, Inc. v. L.A. Wenger Contracting Co.*, 56 A.D.2d 908, 393 N.Y.S.2d 42, 44 (App.Div.1977) (distinguishing *Broderick* and refusing to grant summary judgment where general contractor was being sued for negligent pipe installation and work was undertaken for plaintiff); *cf. Broderick*, 93 N.E.2d at 631 (stating that general contractor is not "obliged to protect employees of his subcontractors against the negligence of his employer or that of a fellow servant"); *Moore*, 165 N.E. at 835 (involving plank that fell to floor and injured plaintiff while subcontractor was working on flooring).

The issue in the cases cited by Bovis involves the question of when a general contractor has a duty to protect third parties from accidents caused by a subcontractor, as opposed to the duty to supervise work for the owner. The plaintiff in this case does not contend that Bovis should be vicariously liable for the acts of the subcontractors. The issue is whether and to what extent Bovis had a duty to Prada to supervise and inspect the installation of the security gate, firestopping, and ductwork insulation, and whether Bovis is liable to Prada for Bovis's own failure to exercise due care in performing what the contract required. *See Wausau Bus. Ins. Co. v. Turner Constr. Co.*, 143 F.Supp.2d 336, 343 (S.D.N.Y.2001) (finding that contractual duty to inspect and supervise construction could render general contractor responsible for lapses by subcontractors); *Genovese Drug Stores*, 393 N.Y.S.2d at 44; *see also Serwatka v. Freeman Decorating Corp.*, No. 00 Civ. 4097, 2001 WL 1203805, at *8 (S.D.N.Y. Oct.10, 2001) (stating that liability may exist where defendant's relationship with tortfeasor or plaintiff places defendant in best position to protect against risk of harm).[5]

For all the reasons explained above, material issues of fact exist as to the extent of Bovis's duties to Prada under the contract and common law and whether Bovis failed to fulfill them. Bovis's motion for summary judgment must therefore be denied as to both claims against it.

## IV.

Travelers has also sued BBB for breach of contract and negligence. BBB was the local architect of record during the construction of the premises in 1996. Its job was to conform designs and construction drawings prepared by Prada's Italian architect to local building codes.

5. Bovis also attempts to avoid liability by arguing that a construction manager is not liable for the negligent construction of a building when it relies on and follows the plans, designs, and specifications of the architects and engineers, and when those plans are not so apparently defective that an ordinary manager of ordinary prudence would be put on notice that the work was dangerous and likely to cause injury. The cases cited by Bovis, however, involve a contractor's liability to third parties when the project, as designed by the owner, created a dangerous condition. *See Morriseau v. Rifenburg Constr., Inc.*, 223 A.D.2d 981, 636 N.Y.S.2d 883, 885 (App.Div. 1996); *cf. Morales v. City of New York*, No. 92 Civ. 3813, 1994 WL 509927, *4 (S.D.N.Y. Sept.16, 1994) (explaining rule and its limitations). The general rule does not absolve Bovis because the claims in this case involve numerous alleged specific duties that were allegedly violated, including the obligation to inspect the work and installation of materials and equipment to protect the owner.

(*See* Aff. of Richard Southwick ("Southwick Aff."), sworn to Mar. 18, 2003, ¶¶ 9–10.) Travelers argues that BBB had the duty to ensure that the security gate installation and construction plans, in general, conformed to local codes-such as the code requiring firestopping. (*See* Pl.'s First Am. Compl. ¶¶ 55–59 (Fifth Claim for Relief), 60–64 (Sixth Claim for Relief).)

BBB reviewed and approved plans that depicted the security gate on the inside of the store, where the doors would have shielded the open slot in the gate from the outside. (*See* Southwick Aff. ¶¶ 14–17, Ex. C) (plans showing security grill to be installed on inside of store); Riverso Rep. at 7 (confirming that configuration of gate and doors shown on plans would have prevented cold air from entering store). The security gate was initially installed on the inside of the store, and BBB provided its last services to Prada in October 1996, before the security gate was relocated. (*See* Southwick Aff. ¶ 19, Ex. D) (time sheets showing that no BBB work was done on Prada project after October 25, 1996 payroll period); Bovis's Rule 56.1 St. ¶¶ 9–10 (stating that security gate was initially installed on inside of store in October 1996 and relocated in mid-November 1996). BBB correctly contends that, as the plaintiff responding to a motion for summary judgment, Travelers must come forward with some evidence on the basis of which a jury could find that BBB breached its contract or was negligent. BBB, therefore, seeks summary judgment on the grounds that it cannot be responsible for the work done after BBB completed its involvement with the store construction.[6]

The plaintiff first argues that there are material facts in dispute over the extent of BBB's involvement and duties after Octo-

ber 1996. The plaintiff claims that Bovis notified BBB that the doors were being relocated, and it argues that based on this knowledge BBB had a duty to ensure that the doors were being installed properly. The plaintiff relies on the deposition testimony of McKinley, the project manager for Bovis, that it would have been the usual process to notify BBB of changes to the storefront. (*See* Nov. 20 McKinley Dep. at 64–65.) But McKinley merely testified that he had a conversation with Southwick of BBB, where he asked Southwick whether there would be "landmark objections"-objections from the Landmarks Preservation Commission-to moving the security gate. (*Id.* at 65). McKinley further testified that he did not recall Southwick's response and had no other recollection that BBB was aware of the changes being made. (*Id.*)

Southwick has testified that any such question would have been posed to him as a hypothetical, that he was not asked to review any plans, and that he did not know that the doors were actually being moved. (Reply Aff. of Richard Southwick, sworn to May 16, 2003, ¶¶ 6–9.) There is no evidence that BBB was informed about the specifics of the relocation, asked to look at the new design plans, or in any other way brought back into the project. Even if BBB had notice of the relocation, there is no evidence that it had any responsibility in connection with the relocation.

Second, the plaintiff argues that regardless of BBB's involvement with the relocation of the security gate,

> BBB had the responsibility, as the architect of record on the project, to note on the construction documents filed with the building department that exterior

---

6. Neither BBB nor Travelers make any distinction in their papers between the breach of contract and negligence claims against BBB. It is clear that both causes of action were premised on the same set of facts and arguments, and BBB seeks summary judgment on both claims against it.

insulation should be installed for the building's exterior envelope and that all contractors must comply with building code fire stopping requirements, which would include fire safing and the requirement for controlled inspection of same.

(Riverso Aff. ¶ 7.) The plaintiff thus argues that BBB, by failing to make specifications and notes on the plan documents, is partially responsible for the lack of insulation and firestopping and thus partially responsible for the freezing of the pipe. (*See id.* ¶¶ 7–8; Riverso Rep. at 3–4, 5.) The plaintiff, however, has not presented any evidence that BBB had or breached a duty that existed under either the contract or the common law.

With respect to the perimeter insulation, Riverso reported that he "did not observe" any notes or specifications "on any document reviewed," but his conclusions were subject to revision upon reviewing the "complete core and shell drawings." (*See* Riverso Rep. at 3, 4 n. 2.) Insulation of exterior perimeter areas would have been handled under BBB's role in preparing the core and shell drawings (*see id.* at 5), but Riverso did not review any further drawings or supplement his report. (*See* Tr. of Dep. of Riverso ("Riverso Dep."), dated July 15, 2002, at 47 (stating that only documents reviewed were those listed in report and acknowledging possibility that specifications for firestopping and insulation existed elsewhere), attached at Reply Affirmation of Robert Bernstein ("Bernstein Reply Affirm."), dated May 19, 2003, Ex. C.) With respect to the firestopping, while Travelers initially argued that BBB breached its duty by failing to call for a code-required firestopping inspection, it is now clear that such an inspection took place on September 25, 1996 and that the Prada store was certified for firestopping. (*See* Bernstein Reply Affirm., Ex. D (certificate of inspection of firestopping by New York City Department of Buildings).)

Even if BBB did not note the need for perimeter insulation or firestopping on plan documents, Travelers has presented no evidence that such a duty existed. Travelers' expert contends that BBB was required to make notes and specifications as the "architect of record." However, when Riverso was questioned in his deposition, he was unable to provide any basis for his use of the term "architect of record." (*See* Riverso Dep. at 45). Moreover, there is no support for such a duty in BBB's contract with Prada, which consisted of a short, two-page letter agreement. (*See* Southwick Aff., Ex. B.) Under the agreement, BBB was required to "[r]eview design drawings for compliance with New York City Building Code requirements," assisting the Italian architect in conforming his drawings to such codes and giving special consideration to the "multi-story open stair, exiting capacities and handicap accessibility standards." (*Id.* at 1.) BBB was also required to "[p]repare a filing set of Building Department drawings ... with DOB annotations and calculations generated by [BBB]." (*Id.*) BBB fulfilled the duties described in the contract by reviewing, approving, and filing plans that placed the gate on the inside of the store. (*See* Southwick Aff. ¶¶ 14–17, Ex. C; Riverso Rep. at 7.) There is no dispute that the plans were filed with the Building Department and that the Building Department did conduct an inspection. (*See* Riverso Rep. at 9 (listing drawings prepared by BBB that Riverso obtained from New York City Department of Buildings); Bernstein Reply Affirm., Ex. D (firestopping inspection certificate).) Travelers has presented no evidence that the plans reviewed by BBB were defective for failure to include any specifications required by the Building Code.

Travelers has thus failed to present any evidence that BBB failed to comply with any obligations that it had under its con-

tract or that it negligently performed the limited duties that it undertook. Nor has the plaintiff presented any evidence to show that the pipe's freezing or the damages caused by flood were proximately caused by an action or inaction for which BBB was responsible. Summary judgment on behalf of BBB is therefore granted on all claims against it.

## V.

Travelers has sued Giamboi for negligence. Giamboi was retained by Bovis as the subcontractor for the carpentry and rough drywall work at the store. (*See* Freedman Aff., Ex. R ("Giamboi Contract").) Giamboi's duties were to install all insulation and include "firesafing at all penetration points through fire rated gypsum board penetrations." (*See id.*, Exhibit B to the Giamboi Contract, at 5.) The plaintiff argues that Giamboi failed to install insulation and firestopping around a duct that penetrated sheetrock, which should have sealed off the area above the roll-down security gate. Had that area been sealed, the plaintiff claims, cold air would have been prevented from circulating through the first floor ceiling space. Giamboi argues, first, that the plaintiff's theory is based on the expert testimony of Riverso, which should be excluded; and, second, that Giamboi is not responsible because it was not involved in the installation of the security gate.

■ Giamboi first urges the Court to exclude the testimony of the plaintiff's expert under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The argument is without merit. Under *Daubert* and Rule 702, the Court exercises a "gatekeeping function" to assure that purported expert testimony is both relevant and that the opinions were based on sufficient facts or data and were the product of reliable principles and methods applied reliably to the facts of the case. *See Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. But Giamboi is not challenging the reliability of Riverso's scientific methods and their application in this case. In fact, Giamboi's own expert reached virtually the identical conclusion as to the cause of the pipe freezing and bursting. (*See* Rep. of Paul Cooper, P.E., attached at Freedman Aff., Ex. Q). Giamboi's basic objection is that Riverso, prior to making his report, had not reviewed Giamboi's contract and thus could not conclude that Giamboi was actually responsible for the lack of firestopping and insulation. Whether the details of Giamboi's contract make Giamboi legally responsible does not implicate Riverso's scientific methods.

■ Because the contract has now been produced, the issue is whether Giamboi is potentially liable for the lack of firestopping and insulation. Under its contract, Giamboi was required to install the insulation and firestopping materials. Giamboi's responsibility to this extent has been confirmed by the deposition testimony of McKinley, Bovis's project manager. (Tr. of Dep. of McKinley, dated Dec. 14, 2001, at 71–74, attached at Freedman Aff., Ex. J.) There is also testimony by Bovis's superintendent, Ronald Kurtz ("Kurtz"), that the ductwork in the Prada store was done before the walls were erected and topped off. (Tr. of Dep. of Kurtz, dated Aug. 1, 2002, at 137–38, attached at Freedman Aff., Ex. L.) The plaintiff thus argues that as the party responsible for drywall and framing work, Giamboi had the duty to insulate and firestop any openings adjacent to the ductwork in the wall space.

Giamboi was not involved in the project when the security gate was relocated, and thus could not be responsible for the opening created by the security gate itself. But Riverso has opined that even without the security gate being relocated,

Giamboi still had a duty to install insulation and firestopping in interstitial spaces and openings adjacent to the ductwork. (Riverso Aff. ¶¶ 11–13.) Had those openings and spaces been sealed and insulated, Riverso claims, the freezing would have been prevented. At the argument of the motions, the point was raised, though not by Giamboi, that an inspection for firestopping had occurred and the store was certified as being in compliance with the firestopping requirements. (*See* Bernstein Reply Affirm., Ex. D (firestopping inspection certificate).) Riverso, however, did not observe any firestopping or insulation when he inspected the area, and there is an issue of fact as to whether the proper firestopping or insulation was installed in the area above the security gate. (*See* Riverso Rep. at 6–7.)

Summary judgment on behalf of Giamboi is therefore denied because there are genuine issues of material fact over whether Giamboi had and breached any duty to perform work that would have prevented the cold air from entering the ductwork and freezing the pipe.

## VI.

Sirina has moved for summary judgment dismissing all claims against it. Sirina was initially sued as a third-party defendant by defendant and third-party plaintiff, Bovis.[7] The third-party complaint claimed that Sirina is required to indemnify Bovis for any damages arising out of its work, that the damages to the Prada store were caused by Sirina's negligence, and that Sirina breached its contract by failing to procure for Bovis commercial general-liability insurance coverage and to defend and indemnify Bovis for damages arising out of Sirina's work. (Third Am. Third–Party Compl. ¶¶ 7–17, attached at Sirina's Rule

56.1 St., Ex. A.) The plaintiff Travelers then asserted a claim against Sirina for negligence. (Pl.'s First Am. Compl. ¶¶ 85–89 (Eleventh Claim for Relief).) Travelers, however, has conceded that there is no basis for a claim against Sirina and has withdrawn its opposition to Sirina's motion for summary judgment. Bovis continues to oppose Sirina's motion.

Sirina was hired to install the sprinkler system at the store and acknowledges that it used the cast iron elbow fitting that froze and broke. Bovis repeatedly asserts that the pipe fitting was "substandard" and did not conform to or comply with "the mechanical engineer's specifications." (Bovis's Rule 56.1 St. (Responding to Sirina's Rule 56.1 St.) ¶¶ 6, 7). But the report and deposition testimony of Bovis's expert make it clear that the only "problem" with the elbow joint was that it was not stamped with a manufacturer's identifying mark or name, as allegedly required by the Building Code of New York City. (*See* Rep. of Lennard Wharton, Ph.D., P.E., at 2–3, attached at *id.*, Ex. A; Tr. of Dep. of Lennard Wharton, dated Jan. 29, 2003, at 63–65 ("Wharton Dep."), attached at *id.*, Ex. B.) Bovis's expert did not test the strength or fitness of the elbow fitting, and he explicitly stated that his conclusion was *not* that the pipe's "marking [was] missing, therefore, it's weak." (Wharton Dep. at 64.) Bovis's sole contention is that the lack of an identification marking is contrary to New York City law and makes the elbow fitting substandard.

 It is well established under New York law that a violation of a City ordinance does not constitute negligence per se, and although it may be some evidence of negligence, the plaintiff must still show that the violation was a "substantial

---

**7.** Sirina was initially sued by both Bovis and 28 East 70th Street Construction Co., Inc., but with 28 East 70th Street Construction effectively dismissed from the action, Bovis is the only third-party plaintiff pressing a claim against Sirina.

factor" or proximate cause of the injury at issue. *See* 1A New York Pattern Jury Instruction: Civil 2:29 (3d ed.2003); *see also Huerta v. N.Y. City Transit Auth.,* 290 A.D.2d 33, 735 N.Y.S.2d 5, 12 (App. Div.2001) (ruling that building code violation does not constitute negligence per se but is evidence of negligence, and plaintiff must show that failure to comply with building code was proximate cause of injury); *cf. Elliott v. City of New York,* 95 N.Y.2d 730, 724 N.Y.S.2d 397, 747 N.E.2d 760, 762–64 (2001) (holding that violation of city ordinance does not constitute negligence per se). The failure to contain the manufacturer's identification number, whether a violation of the building code or not, clearly did not proximately cause the pipe to freeze and burst. No party has represented that there was any defect in the pipe that caused it to freeze and burst. There is no evidence that the damages from the flooding were caused by any alleged failure on the part of Sirina. There is no basis for Bovis to seek contribution or indemnification from Sirina based on the absence of any markings on the pipe.

Summary judgment therefore is granted on behalf of Sirina as to all claims against it by all parties.

### Conclusion

For the reasons explained above, the motions for summary judgment on behalf of Bovis and Giamboi are denied. Summary judgment is granted with respect to all claims against BBB and Sirina. All claims against 28 East 70th Street Construction Co. are also dismissed.

**SO ORDERED.**